# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

David O. Colbenson,

       Plaintiff,

v.

Michael J. Astrue,
Commissioner of Social
Security,

       Defendant.

Civ. No. 11-1353 (JJK)

**MEMORANDUM
OPINION AND ORDER**

---

Jed. J. Hammell, Esq., Rippe Hammell & Murphy, PLLP, counsel for Plaintiff.

David W. Fuller, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff David O. Colbenson seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's application for disability insurance benefits. This matter is before the Court on the parties' cross-motions for summary judgment. (Doc. Nos. 10, 14.) The parties have consented to this Court's exercise of jurisdiction over all proceedings in this case pursuant to 28 U.S.C. § 636(c), and Federal Rule of Civil Procedure 73. (Doc. Nos. 8, 9.) For the reasons stated below, the Court denies Plaintiff's motion and grants Defendant's motion.

# BACKGROUND

## I.    Procedural History

Plaintiff protectively filed an application for disability insurance benefits ("DIB") on January 9, 2006, alleging a disability onset date of January 1, 2003. (Tr. 10.)[1]  His date last insured was March 31, 2003.[2]  (Tr. 23.)  Plaintiff's application was denied initially and on reconsideration.  (Tr. 67–71, 74–76.) Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on September 18, 2008.  (Tr. 77–78, 19-55.)  On October 17, 2008, the ALJ issued an unfavorable decision.  (Tr. 7–18.)  Plaintiff sought review of the ALJ's decision, but the Appeals Council denied the request for review on March 25, 2011.  (Tr. 1–3.)  The denial of review made the ALJ's decision the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822–23 (8th Cir. 1992).  On May 25, 2011, Plaintiff filed the instant action with this Court seeking judicial review pursuant to 42 U.S.C. § 405(g).  The parties have filed cross-motions for summary judgment.  *See* D. Minn. Loc. R. 7.2.

---

[1]    Throughout this Memorandum Opinion and Order, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 7).

[2]    A claimant has to establish "the existence of a disability on or before the date that the insurance coverage expires."  *Basinger v. Heckler*, 725 F.2d 1166, 1168 (8th Cir. 1984).

## II.    Statement of Facts[3]

Plaintiff is a high school graduate and he completed one year of college. (Tr. 141.)  He is a Vietnam veteran.  (Tr. 217.)  After the war, he purchased a dairy farm and managed it since 1971.  (Tr. 137.)  In 1995, Plaintiff was diagnosed with mental illness, but he continued to work on his farm through his alleged onset date of January 1, 2003.  (Tr. 136.)

### A.    Medical Evidence Received Before the Hearing

Plaintiff was admitted to St. Peter Regional Treatment Center ("St. Peter's") on April 25, 1995, his fourth mental health hospitalization.  (Tr. 215.)  He had recently stopped his antipsychotic medication, and his behavior became bizarre, agitated, restless, paranoid, and delusional.  (Tr. 215–16.)  For example, on April 24, 1995, the police were called to Plaintiff's house after he struck his wife in the face.  (*Id.*)  And Plaintiff also made a statement that sounded like a threat against his wife.  (*Id.*)  On May 16, 1995, Plaintiff was court-committed as mentally ill, and he gradually developed limited insight into his illness.  (Tr. 204–05.)  On July 27, 1995, Plaintiff was discharged with a diagnoses of delusional disorder, not otherwise specified ("NOS") and rule out schizophrenia, chronic paranoid type.  (Tr. 203, 205.)  He continued to receive case management

---

[3]    In his motion for summary judgment, Plaintiff challenges the ALJ's determination of his mental impairments and limitations only.  Thus, the Court will not summarize medical records related to Plaintiff's physical complaints.

services from Winona County Human Services and psychiatric care from Hiawatha Valley Mental Health Center.  (Tr. 205.)

When Plaintiff saw Dr. George Planavsky at Hiawatha Valley Mental Health Center on August 8, 1999, Dr. Planavsky saw no evidence of paranoia or overt psychosis.  (Tr. 544.)  In November 1999, Plaintiff said he was having financial difficulty, but there was no other change in his status.  (Tr. 545.)  Plaintiff spoke very coherently, and Dr. Planavsky believed Plaintiff was doing well.  (*Id.*)  Plaintiff was "very stable" on December 11, 2000, and felt his medication kept him calm and functioning well.  (Tr. 547.)  Six months later, Plaintiff talked about difficulties at his farm, but he was functioning well.  (Tr. 548.)  He was comfortable with his medication, and appeared to be thinking clearly, with no evidence of paranoia, agitation, or hostility.  (*Id.*)

In October 2001, Dr. Planavsky found Plaintiff to be doing reasonably well, with no overt evidence of psychosis.  (Tr. 549.)  In January 2002, Plaintiff reported that was stressed because his wife was in the hospital, and he had financial difficulties with his farm.  (Tr. 550.)  However, he felt his medication would help him through difficult times.  (*Id.*)  Dr. Planavsky felt Plaintiff was doing the best he could under adverse conditions.  (*Id.*)  In May 2002, Plaintiff was separated from his wife and preoccupied with his farm work.  (Tr. 551.)  However, Dr. Planavsky saw no overt evidence of psychosis and noted that Plaintiff was followed by a public health nurse on a regular basis, and Dr. Planavsky also read the nurse's notes.  (*Id.*)

4

Plaintiff had no symptoms when he saw Dr. Planavsky on August 5, 2002. (Tr. 552.)  He was spending positive time with his wife, and talked about his farm and children.  (*Id.*)  When Plaintiff returned in November 2002, he reported having some difficulties with his thought process after he was two weeks late in getting his medication, which he received by injection.  (Tr. 553.)  He tried to describe his thoughts about a political system having something to do with horoscopes, but said he did not think about it when he got his medication on time.  (*Id.*)  Plaintiff also reported that he was having great financial difficulties, making no money in the dairy business.  (*Id.*)  Despite Plaintiff's tremendous stress, Dr. Planavsky noted that Plaintiff presented with organized thoughts and no overt evidence of delusions, hallucinations, or paranoia.  (*Id.*)  Plaintiff stated that he did not want Dr. Planavsky to increase his medication because it made him drowsy, but he said his symptoms "stay[ed] out of his awareness" on his current medication.  (*Id.*)

On February 18, 2003, Plaintiff's mental status again was clear with no overt evidence of delusion, hallucination, or paranoid ideation.  (Tr. 554.)  His farm was doing well, and his wife was returning.  (*Id.*)  At that time, Dr. Planavsky agreed to decrease Plaintiff's medicine.  (*Id.*)  In May 2003, Plaintiff told Dr. Planavsky that he was facing the loss of his farm, but he should be in reasonable financial shape after it sold.  (Tr. 555.)  He stated that he and his wife were talking about buying a house and both working after the farm sold.  (*Id.*)  Plaintiff asked for another decrease in his medication, and Dr. Planavsky agreed.

(*Id.*)  After this visit, Dr. Planavsky stated, "[a]ll in all, I would say that he is functioning pretty well right now."  (*Id.*)

Several months later, Dr. Planavsky noted that Plaintiff was doing very well, and he was working out his financial difficulties in an orderly and thoughtful manner.  (Tr. 556.)  Dr. Planavsky did not see any overt evidence of psychosis, suspiciousness, paranoid ideation, delusion, or hallucinations.  (*Id.*)  Plaintiff's affect was bright, and his mood was euthymic.  (*Id.*)

Plaintiff regressed in November 2003, and Dr. Planavsky was almost certain the regression was caused by too much time between Prolixin[4] injections. (Tr. 557.)  Plaintiff agreed to increase his injections to every two weeks.  (*Id.*)  He had been having delusional thoughts of a conspiracy of grand proportions before his medicine kicked in.  (*Id.*)  Plaintiff was back to his usual level of functioning on December 15, 2003.  (Tr. 558.)  However, he reported having some bad side effects from Prolixin, so Dr. Planavsky agreed to reduce his medication to injections every three weeks.  (*Id.*)  Otherwise, Plaintiff seemed to be doing well, and he was looking for employment because he was no longer making money on his farm.  (*Id.*)

Ten months later, when Plaintiff saw Dr. Planavsky on October 11, 2004, his thinking was clear, and he had fewer worries.  (Tr. 561.)  In February 2005,

---

[4]      Prolixin, the generic version is fluphenazine, is an antipsychotic medication used to treat schizophrenia and psychotics symptoms such as hallucinations, delusions, and hostility.  *See* http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0000603/.

Dr. Planavsky noted that Plaintiff's thinking seemed clear and he talked about some good things in his life. (Tr. 562.) In May 2005, Dr. Planavsky observed that Plaintiff's thinking continued to be clear and coherent, and in October 2005, Plaintiff "seem[ed] to be doing fine." (Tr. 254, 563.) Then, on February 13, 2006, Plaintiff denied symptoms and side effects, and talked about his wife and children. (Tr. 253.)

In January 2006, Plaintiff was evaluated by Michael Knapp, a social worker at Tomah (LaCrosse) VA Medical Center. (Tr. 249–50.) On mental status examination, Plaintiff was oriented with neutral mood, appropriate affect, intact insight and judgment, unimpaired cognition, and normal speech. (Tr. 249.) Plaintiff described his military service to Knapp, and explained that he was part of a radar team in Vietnam that saw combat. (*Id.*) He reported that he began having disturbing memories and dreams of combat soon after discharge. (*Id.*) Plaintiff believed that financial stress from his farm caused his earlier nervous breakdown and hospitalization. (Tr. 250.) He was experiencing regular incidents of intrusive thoughts, disturbed sleep related to combat memories, and nightmares. (Tr. 249.)

Plaintiff continued to tell Knapp about his Vietnam experiences at their next session on February 10, 2006. (Tr. 512–14.) Plaintiff stated that he felt alienated when he returned home from Vietnam and he did not talk to anyone about his experiences because he did not think that anyone would understand. (*Id.*) He explained that he was engaged before the war and married upon return, and that

within a few years, he bought a farm and worked in the dairy business.  (*Id.*)  He had memories of Vietnam every day and frequent nightmares.  (*Id.*)  He had an exaggerated startle response to loud noises and was hypervigilant in public.  (*Id.*)  Knapp concluded that Plaintiff met the diagnosis for PTSD.  (Tr. 514.)  He also diagnosed Plaintiff with psychotic disorder, NOS, and depressive disorder, NOS.  (Tr. 512.)

Plaintiff saw Knapp again on March 9, 2006.  (Tr. 286.)  At that time, Plaintiff had completed filing his claim for PTSD, and felt less anxiety after completing the stressor reports.  (*Id.*)  Plaintiff's relationships were in good standing, and he was sleeping better the past week.  (*Id.*)  At Plaintiff's next session with Knapp on May 11, 2006, Plaintiff reported that his condition had not changed – he was experiencing the usual ups and downs, with particular stress over his wife's health.  (Tr. 321.)  One month later, Plaintiff's condition was stable and unchanged.  (Tr. 310.)

Plaintiff saw Dr. Planavsky for a medication check on June 21, 2006.  (Tr. 325.)  Plaintiff reported that things were going very well, and he expected to get benefits for PTSD.  (*Id.*)  Plaintiff also continued to feel that his medication worked well for him.  (*Id.*)  The next day, however, the Department of Veteran Affairs issued a decision denying service connected disability for post traumatic stress disorder and tardive dyskinesia.  (Tr. 471–75.)  The denial for PTSD disability was based on Plaintiff's failure to submit sufficient evidence regarding stressful combat incidents.  (Tr. 472.)

Upon visit with Dr. Planavsky on August 9, 2006, Plaintiff was "relatively stable" but stressed about his wife's decision to divorce him.  (Tr. 309–10.) Dr. Planavsky completed a Mental Residual Functional Capacity Questionnaire regarding Plaintiff on August 14, 2006.  (Tr. 293–97.)  He diagnosed Plaintiff with chronic paranoid schizophrenia, with a current GAF score of 50.[5]  (Tr. 293.)  In addition, Dr. Planavsky noted, "Mr. Colbenson has a serious & persistent mental illness that is treated with antipsychotic medication[,] medicine helps with symptoms, but, does not cure the illness."  (*Id.*)  The questionnaire contained a box listing signs and symptoms of mental illness, and Dr. Planavsky checked many of the boxes.  (Tr. 294.)  The questionnaire also contained a chart listing mental abilities and gave the following choices for rating the claimant's abilities:  unlimited or very good, limited but satisfactory, seriously limited but not precluded, unable to meet competitive standards, and no useful ability to function.  (Tr. 295–96.)  Dr. Planavsky checked "unable to meet competitive standards" for the following abilities:  work in coordination with or proximity to

---

[5]     The Global Assessment of Functioning ("GAF") scale, a point scale of 0 to 100, is used by clinicians to report an individual's overall level of functioning.  *Diagnostic and Statistical Manual of Mental Disorders* "(*DSM-IV-tr*") 32 (4th ed. text revision 2000).  Scores of 31–40 indicate some impairment in reality testing or communication or major impairment in several areas such as work or school or family relations, judgment, thinking or mood.  Scores of 41–50 indicate serious symptoms or any serious impairment in social, occupational or school functioning.  Scores of 51–60 indicate moderate symptoms or any moderate impairment in social, occupational or school functioning.  Scores of 61–70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.  *Id.* at 34.

others without being unduly distracted; complete a normal workday or workweek without interruptions from psychologically based symptoms; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; deal with normal work stress; deal with stress of semiskilled and skilled work; and interact appropriately with the general public. (*Id.*) In addition, Dr. Planavsky anticipated that Plaintiff's impairment or treatment would cause him to be absent from work more than four days per month. (Tr. 297.)

Plaintiff saw Knapp again in September 2006, and showed some improvement in stress from his divorce. (Tr. 308–09.) But in November 2006, without activities to distract him, Plaintiff had intrusive memories about combat. (Tr. 307.) Yet Plaintiff reported doing fine despite a tremendous amount of stress on December 20, 2006, when he saw Dr. Planavsky. (Tr. 324.) At that time, Dr. Planavsky stated, "I felt his thinking was clear, and there was no evidence of paranoia or delusional thinking." (*Id.*)

On February 14, 2007, Plaintiff underwent an initial evaluation for PTSD with Dr. Brian Engdahl. (Tr. 463–67.) When asked what prompted him to apply for service-connected disability, Plaintiff stated that he had a declining ability to work his small farm, he had been under considerable financial stress for many years, and he was encouraged by other veterans to apply for disability. (Tr. 463–64.) Dr. Engdahl noted that there was no question that Plaintiff was exposed to combat trauma and that he served honorably in sometimes dangerous circumstances. (Tr. 464.) Plaintiff reported that his daily painful memories of

Vietnam were brief and not too distracting. (*Id.*) And in the winter months, he could sleep largely without experiencing nightmares. (Tr. 465.) When it was warm and humid in the summer, he would have nightmares many nights a week and wake up frightened, thinking he was in Vietnam. (*Id.*) Dr. Engdahl noted that Plaintiff's sleep difficulties were variable and were also affected by drinking a great deal of coffee. (*Id.*) Plaintiff denied irritability and being quick to anger. (*Id.*) He complained of trouble concentrating but there was no evidence of that in the interview. (*Id.*) Plaintiff also stated that he experienced hypervigilance and exaggerated startle response, but he did not have significant avoidant behaviors of things that reminded him of Vietnam. (*Id.*) However, Plaintiff did say that he was very isolated since he returned from Vietnam, and he still avoided crowds. (Tr. 466.)

Dr. Engdahl also reviewed Plaintiff's daily activities. (Tr. 465.) Plaintiff typically went into town in the morning for a meal and to talk to "the boys." (*Id.*) After doing a few chores at home, he went to the American Legion in the afternoon. (*Id.*) Once a week, he would have a nice meal in town, talking to whomever he encountered. (*Id.*) He watched the futures market and also tried to walk two to five miles a day. (*Id.*) He listened to talk radio "24 hours per day" and did some reading. (*Id.*) Plaintiff also took the MMPI-2, but the results were not interpretable because he over-endorsed symptoms in such a way that might suggest malingering. (Tr. 466.) Ultimately, Dr. Engdahl opined that Plaintiff's hypervigilance, startle response, and painful memories were "not particularly

disabling." (*Id.*)  He diagnosed Plaintiff with paranoid schizophrenia versus paranoid delusional disorder in sustained partial remission, and assessed a GAF score of 70.  (Tr. 467.)  Thereafter, the Department of Veterans Affairs denied Plaintiff's claim for service-connected PTSD disability on April 27, 2007. (Tr. 476–84.)

Also in April 2007, Knapp opined that Plaintiff's condition was about the same.  (Tr. 305–06.)  At that time, Plaintiff's divorce was unresolved, and he was coping with financial stress.  (Tr. 305.)  But he was keeping busy with "the business of the farm."  (Tr. 306.)  On May 15, 2007, Dr. Planavsky noted that Plaintiff's current medication regimen "really seems to keep him symptom free." (Tr. 323.)  Then, Knapp noted that Plaintiff's condition was stable in June 2007, after reaching a settlement with his wife over their divorce.  (Tr. 305.)  Plaintiff, however, still reported daily flashbacks and nightmares about Vietnam, stating that heat and darkness were triggers for his PTSD symptoms.  (*Id.*)  Plaintiff's condition remained stable in August 2007, but Plaintiff reported to Knapp that he was increasingly upset about the Iraq war.  (Tr. 304.)  Plaintiff had no serious problems to report in September 2007, but he was frustrated over delays with his PTSD claim.  (Tr. 304.)    Also in September, Dr. Planavsky remarked that Plaintiff was "doing very well" and had no symptoms.  (Tr. 322.)  He reduced Plaintiff's medication and stated that Plaintiff would be watched closely for any sign of regression.  (*Id.*)

On November 8, 2007, Dr. Planavsky wrote a letter to Plaintiff's attorney regarding Plaintiff's unsuccessful disability claim. (Tr. 439.) Dr. Planavsky wrote:

> Mr. Colbenson, in my mind, is clearly a man who has had serious and persistent mental illness with a diagnosis of chronic paranoid schizophrenia. He, indeed, is an individual who tends to minimize his problem; in fact, at times, he believes that everything he experiences is more a factor of Agent Orange than a serious and persistent mental illness. His chronic paranoid schizophrenia has been present through most of his adult life and certainly he had serious and persistent mental health issues prior to March 31, 2003. While David can do well with his medications at times, there are also times when he continues to have symptoms which I have outlined for you previously.

(*Id.*)

Plaintiff saw Dr. Planavsky again on January 8, 2008. Dr. Planavsky described Plaintiff as doing "very, very well," and noted that he was relating with clear, coherent thinking. (Tr. 573.) At this meeting, Plaintiff asked Dr. Planavsky to talk with someone from the VA about his PTSD issues. (*Id.*) Thereafter, Plaintiff's medication was decreased, and in February 2008, Plaintiff was having more symptoms. (Tr. 572.) Plaintiff, however, did not want to increase Prolixin because it made him feel bad, but he agreed to try risperidone. (*Id.*)

On March 18, 2008, Dr. Planavsky wrote to the Washington County Veteran Service Office in support of Plaintiff's PTSD disability claim. (Tr. 565–66.) He strongly concurred with Knapp's diagnosis and documentation of Plaintiff's PTSD. (*Id.*) He also stated:

> I know that David tends not to talk about his negative experiences or about his difficulties in life and likes to put a brave face on things, even when things are going very poorly in his life. I suspect he has

done this all of his adult life.  Early on, after his return from service, there is considerable evidence he tried to minimize, deny and avoid the impact his experiences burdened him with.  I in no way believe that Mr. Colbenson would be confabulating or malingering in reference to these issues.

(Tr. 566.)

In May 2008, Plaintiff reported that he had not taken risperidone, but his thinking was clear and there was no evidence of overt psychosis, so Dr. Planavsky determined it was okay if Plaintiff continued on the lower dose of Prolixin.  (Tr. 571.)  Then, in July 2008, Dr. Planavsky received phone calls from Plaintiff's mother and Plaintiff's public health nurse reporting that Plaintiff was showing symptoms of mental illness.  (Tr. 604.)  Dr. Planavsky increased Plaintiff's dose of Invega[6] to 6 mg per day.  (*Id.*)  There is no record of when Invega was first prescribed but it appears to have been between May and July 2008.

During Plaintiff's August 11, 2008 visit with Dr. Planavsky, Plaintiff said he was taking his pills every day, and his thinking was clearer.  (Tr. 570.)  Plaintiff reported that he recently spent a night in jail after breaking a restraining order requiring him to stay away from his ex-wife's apartment.  (*Id.*)  Plaintiff was wearing soiled clothes and smelled of body odor.  (*Id.*)  His attitude was guarded, and his mood and affect were anxious.  (*Id.*)  However, his speech and thought processes were normal, and there was no evidence of hallucinations or

_____

[6]     Invega is an atypical antipsychotic agent indicated for treatment of schizophrenia.  *See* http://www.pdr.net/drugpages/productlabeling.aspx ?mpcode=40220700.

delusions. (*Id.*) Plaintiff's diagnoses remained delusional disorder, paranoid, and PTSD. (*Id.*) Then, on September 2, 2008, Plaintiff told Dr. Planavsky that the Invega was working well, he took it every day, and it did not make him feel deadened and flat, as Prolixin had. (Tr. 569.) Plaintiff's grooming was improved, his thinking seemed clear, and he spoke rationally. (*Id.*) At that time, Dr. Planavsky increased Plaintiff's dosage of Invega. (*Id.*)

Shortly after Plaintiff's hearing on his social security disability claim, he underwent a competence evaluation for a criminal proceeding; the evaluation was conducted by Dr. Kenneth Dennis on September 26, 2008.[7] (Tr. 619–23.) In his report, Dr. Dennis explained how PTSD that had resolved in the past could become a new problem when immediate memory declined, and old memories acted like they were recent. (Tr. 619.) Dr. Dennis stated, "Mr. Colbenson has PTSD, early-impaired memory, and rigid thinking. At the time of assessment, he still has the capacity to understand the criminal proceedings and participate in his defense, but this capacity appears to be declining." (*Id.*) He also reported that Plaintiff's recent medication change caused him to have feelings he had not experienced for ten or fifteen years. (*Id.*) Dr. Dennis believed that Plaintiff presented an increasing risk to others based on his rigid thinking and blaming other people. (*Id.*) Ultimately, he opined that Plaintiff needed continued neuroleptic medication and PTSD treatment to remain competent. (*Id.*)

---

[7]     The latest medical record described by the ALJ was dated September 2, 2008; therefore, it does not appear that the ALJ received Dr. Dennis' evaluation before issuing his decision. (Tr. 16.)

Regarding Plaintiff's employment, Dr. Dennis noted that Plaintiff farmed for more than thirty years, primarily focusing on dairy, but now on hay because it was a niche that could withstand competition.  (Tr. 621.)  He also noted that Plaintiff's partial retirement provided him too much time to focus on PTSD symptoms.  (*Id.*)

As part of the evaluation, Plaintiff was given the following tests:  Wide Range Achievement Test; Grooved Pegboard; Automated Neuropsychological Assessment Metrics; Stroop, Galvanic Skin Response; and Jesness Inventory.  (*Id.*)  Plaintiff's intelligence was estimated in the normal range, and his cognitive functioning scores were within the below average range.  (*Id.*)  Plaintiff's scores also indicated memory deficits and lack of mental flexibility.  (Tr. 622.)  Personality scores were elevated for inward focus and alienation.  (*Id.*)  Dr. Dennis recommended evaluation for attention deficit disorder.  (*Id.*)  Plaintiff's impulse control was poor; there was a possibility of a mood disorder; and it was unlikely that Plaintiff would seek help because he did not perceive people as being supportive or understanding.  (Tr. 623.)  Dr. Dennis diagnosed Plaintiff with PTSD with delayed onset and assessed a GAF score of 36.  (*Id.*)

## B.    Medical Evidence Submitted After the ALJ's Decision

The ALJ issued an unfavorable decision on Plaintiff's social security disability claim on October 17, 2008.  (Tr. 7.)  The following medical records, dated after the ALJ's decision, were made part of the administrative record.  Therefore, the Court assumes that Plaintiff submitted these records to the

Appeals Council for consideration, and the Appeals Council considered them but denied review.[8]

On February 3, 2009, Plaintiff saw Dr. Planavsky and reported that he felt more alive and emotional on his current medication, whereas Prolixin made him feel "half dead." (Tr. 600.) Clinically, Plaintiff was clear and coherent. (*Id.*) Thereafter, Dr. Planavsky wrote to Veterans' Services on Plaintiff's behalf on March 18, 2009. (Tr. 618.) He reiterated that Plaintiff had PTSD secondary to his Vietnam experience, and opined that the disability should be rated 70–100% because it impacted all areas of Plaintiff's life. (*Id.*)

On April 14, 2009, Plaintiff underwent a court-ordered psychological evaluation with Dr. Bryan Delvin at Hiawatha Valley Behavioral Health Center due to Plaintiff's violation of a protection order and a stalking charge. (Tr. 611–15.) At that time, Plaintiff was given the MMPI-2 personality test, which yielded valid results. (Tr. 611.) The test results indicated symptoms of bizarre sensory experiences combined with feelings of persecution, suspiciousness, chronic feelings of being mistreated, and paranoid thinking at times. (*Id.*) Dr. Delvin noted that treatment prognosis was poor due to difficulty with self-disclosure.

---

[8] The Appeals Council's Order, which typically lists newly submitted evidence considered by the Appeals Council, is missing from the administrative record, but there is a cover letter from Plaintiff's counsel to the Appeals Council stating new evidence was enclosed. (Tr. 1–3, *and see* Tr. 198–200.) Plaintiff does not contend that the Appeals Council failed to consider new material evidence submitted to it. Therefore, this issue is waived. *See Pelkey v. Barnhart*, 433 F.3d 575, 580 (8th Cir. 2006) (finding issue not articulated before the district court was waived).

(*Id.*)  With respect to the violation of the protective order, Plaintiff stated that he happened to see his wife on the street and wanted to talk to her about a bill he received.  (Tr. 612–13.)  Plaintiff also explained that the stalking charge related to occasions when he went to his ex-wife's house to discuss the divorce settlement. (Tr. 613.)  On one occasion they argued, and he kicked over a flower box.  (*Id.*)  After this, he tried calling her several times.  (*Id.*)

On mental status examination, Plaintiff was oriented, of average intelligence, had intact judgment, insight and memory, was relevant and organized, and had coherent thought process and euthymic affect.  (Tr. 614.) Plaintiff referred to people having special abilities and gifts allowing them to sense different things.  (*Id.*)  This was seen as a schizotypal tendency.  (*Id.*)

Dr. Delvin stated the following in his report:

> Current MMPI-2 and treatment record data is congruent with a diagnosis of Schizophrenia, Paranoid Type with acute symptoms presently being well controlled via medication.  Despite this, the client does present with tendencies towards interpersonal suspiciousness and anxious avoidance related to past trauma. There does not appear to be a strong history of impulsive aggression or control issues within relationships.  The client's adjustment following divorce is seen as having been complicated by the features of his mental illness, especially where interpersonal suspiciousness is concerned, resulting in poor judgment and associated problematic behavior.

(*Id.*)  Dr. Delvin recommended outpatient psychiatric services, medication compliance, and group therapy for veterans.  (Tr. 615.)

Thereafter, Plaintiff was screened for veterans' group therapy by licensed social worker David Fruehling at Hiawatha Valley Mental Health Center.

(Tr. 594.)  Plaintiff reported PTSD symptoms of flashbacks, sleeplessness, and intrusive memories.  (*Id.*)  Fruehling recommended that Plaintiff try attending group.  (*Id.*)  Plaintiff attended three groups, and then chose to proceed with individual therapy only.  (Tr. 589, 591, 593.) On July 8, 2009, the Department of Veterans Affairs increased Plaintiff's disability rating for PTSD from 50% to 100%.  (Tr. 625–32.)[9]

On January 5, 2010, Plaintiff attended therapy with Fruehling and reported being moderately anxious with occasional flashbacks of trauma.  (Tr. 586.) Plaintiff was required to participate in therapy by his probation officer, and Plaintiff admitted to problems with socialization.  (*Id.*)  Two weeks later, Plaintiff reported that he did not believe he needed therapy, but Fruehling reminded him it was required to satisfy the court.  (Tr. 585.)  At that time, Plaintiff reported moderate anxious mood and occasional flashbacks of trauma.  (*Id.*)

Dr. Planavsky completed a Mental Residual Functional Capacity Questionnaire regarding Plaintiff on February 2, 2010.  (Tr. 635–40.)  He diagnosed Plaintiff with chronic paranoid schizophrenia and assessed a GAF score of 45 over the past year.  (Tr. 635.)  Dr. Planavsky noted that since he had known Plaintiff, Plaintiff functioned in the GAF score range of 35–45.  (*Id.*)  The questionnaire contained a list of signs and symptoms, and Dr. Planavsky checked many of them.  (Tr. 636.)

---

[9]     Plaintiff was rated 50% disabled by service-connected PTSD with paranoid delusional disorder versus paranoid schizophrenia on November 4, 2008 (Tr. 627), but the rating decision is not in the Administrative Record.

The questionnaire also contained a list of mental abilities, and Dr. Planavsky rated Plaintiff's mental abilities in the following areas as seriously limited but not precluded:  work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; deal with normal work stress; understand, remember, and carry out detailed instructions; deal with stress of semiskilled work; interact appropriately with the general public; and maintain socially appropriate behavior.  (Tr. 637–38.) Dr. Planavsky opined that Plaintiff would be likely to miss four or more days of work per month due to his mental impairments.  (Tr. 639.)  He also believed that Plaintiff had these limitations since they met in 1997.  (Tr. 640.)

III.    **Testimony at the Administrative Hearing**

**Plaintiff's Testimony**

Plaintiff testified to the following at the hearing before the ALJ on September 18, 2008.  (Tr. 19.)  At the time of the hearing, Plaintiff was still trying to manage his farm but he did not do physical work.  (Tr. 27.)  He had 103 acres of farm land, having sold part of his land in 2003.  (*Id.*)  His farm was in a government program, and the primary income came from hay production.

(Tr. 29.)  But Plaintiff did not do his own hay cutting.  (Tr. 30.)  Plaintiff thought his 2007 gross income was $20,000 to $30,000.  (Tr. 36.)

For the last three years, Plaintiff was treated with oxycodone for pain in his legs, having previously taken large doses of over-the-counter medication. (Tr. 32.)  Plaintiff also suffered flashbacks from Vietnam that were triggered by hot weather.  (Tr. 35.)  In addition, he testified that his ability to work had been diminished for a long time and he felt he no longer had any ability to work. (Tr. 42.)

Plaintiff has four daughters, only one of whom would speak to him. (Tr. 35.)  Plaintiff was more comfortable by himself than around other people. (Tr. 37.)  He recently went to his parents' anniversary party but left in anger.  (*Id.*) He believed his prior medication made him brain dead and unfeeling, and his new medication allowed him to feel emotions.  (*Id.*)

Plaintiff usually ate his meals in town because he liked to overhear conversations of others.  (Tr. 38.)  He felt he would go crazy if he were alone all the time.  (*Id.*)  On occasion, but not regularly, he sat with others for his meals. (*Id.*)  Plaintiff stated that he had a good relationship with Dr. Planavsky, but he did not always tell Dr. Planavsky about his problems.  (Tr. 41.)

Plaintiff went to jail after breaking a restraining order his ex-wife had against him.  (Tr. 41–42.)  He stated that they were arguing over whether Plaintiff would pay spousal maintenance in a lump sum or spread out over four years. (Tr. 41.)  Plaintiff changed his mind about refusing to pay a lump sum and went

to see his wife.  (*Id.*)  She locked the door and would not let him in.  (Tr. 42.)  He then kicked over her flower box, and he was arrested.  (*Id.*)

### Medical Expert Testimony

Dr. Mary Louise Stevens testified as a medical expert at the hearing. (Tr. 42–43.)  She noted that Plaintiff's social worker diagnosed him with PTSD, but she could not find a clear, comprehensive PTSD evaluation in the record. (Tr. 43–44.)  She testified that simply due to the nature of his diagnoses, at various times paranoid schizophrenia, psychotic disorder NOS, and paranoid delusional disorder, Plaintiff's daily activities would be mildly impaired, social functioning would be moderately impaired, and concentration, persistence, or pace would be moderately impaired.  (Tr. 43, 46.)  However, Dr. Stevens stated that the records indicated that Plaintiff would not meet or equal any listing during the relevant time period.  (Tr. 46.)  Dr. Stevens opined Plaintiff would be limited to simple, repetitive, unskilled work duties, brief and superficial contact with others, and a low stress work environment.  (*Id.*)  Low stress meant no high production requirements.  (*Id.*)

Dr. Stevens disagreed with Dr. Planavsky's assessment of Plaintiff's ability to work, as described in exhibits 10F, 14F, and 16F.  (Tr. 47.)  Dr. Stevens believed medication "can go a long way" with treating chronic paranoid schizophrenia.  (Tr. 47–48.)  She disagreed with Dr. Planavsky that Plaintiff could not meet competitive standards in dealing with normal work stress because Dr. Planavsky's notes indicated that Plaintiff's illness was well controlled with

taking medication at three-week intervals. (Tr. 48.) Dr. Stevens also found evidence that Plaintiff expressed his thoughts to Dr. Planavsky; in other words, he did not always hide his problems. (Tr. 48–49.)

### Vocational Expert Testimony

Wayne Onkin testified at the hearing as a vocational expert. (Tr. 49.) The ALJ asked the vocational expert a hypothetical question about the type of work a person with the following characteristics could perform: 53–59 years-old; thirteen years education; work experience outlined by the vocational expert; impairments described by the medical expert with varying diagnoses of paranoid schizophrenia, psychotic disorder, and delusional disorder; PTSD mentioned in the record; peripheral neuropathy; limited to simple, repetitive, unskilled work tasks with brief, superficial contacts with others in a work setting with rather low-stress work, that is, precluding high production goals such as working on an assembly line. (Tr. 50–51.) The vocational expert testified that such a person could not perform Plaintiff's past relevant work but could perform other work such as General Farm Worker,[10] Night Cleaner,[11] and Cleaner 2.[12] (Tr. 51–52.) If the ALJ added a restriction of medium exertional work to the first hypothetical

---

[10]   As defined in the Dictionary of Occupational Titles ("DOT") Code 421.687-010, there are about 2,000 such jobs in Minnesota.

[11]   As defined in the DOT Code 323.687-018, there are at least 2,000 such jobs in Minnesota.

[12]   As defined in the DOT Code 919.687-014, there are at least 1,000 such jobs in Minnesota.

question, the vocational expert testified that only the Cleaner 2 job would apply. (Tr. 52.)  The Cleaner 2 job could be performed if the individual were also precluded from using repetitive foot pedals.  (*Id.*)  The vocational expert testified that all work would be precluded if an additional restriction were added that the individual would be absent from work more than three days per month.  (Tr. 53.) The VE agreed that, given the limitations described by Dr. Planavsky, such a person could not meet competitive standards in dealing with work stress, even in the jobs identified by the vocational expert.  (*Id.*)  The same was true of a person who would be unable to complete a normal workday and workweek without interruption from psychologically based symptoms.  (Tr. 53–54.)

## IV.    The ALJ's Findings and Decision

On October 17, 2008, the ALJ issued a decision concluding that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from the alleged onset date of January 1, 2003, through the date of the decision. (Tr. 17–18.)  The ALJ followed the five-step procedure for determining whether an individual is disabled.  *See* 20 C.F.R. § 404.1520(a).  At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2003, through his date last insured of March 31, 2003.  (Tr. 12.)

At the second step of the evaluation, the ALJ determined that Plaintiff had a severe impairment of paranoid schizophrenia.  (*Id.*)  But the ALJ found that Plaintiff did not have a severe impairment of PTSD for the following reasons:

Plaintiff did not meet the military requirement of proving combat exposure (Tr. 12 (citing Exhibit 15F/2-3)); Plaintiff failed to provide the VA with a written list of his stressors (*Id.*); Plaintiff failed to report for his VA evaluation (*Id.*); Plaintiff never had a comprehensive PTSD evaluation (*Id.*); and the medical expert had noted that Plaintiff was doing so well on his medications that he wanted to cut back. (*Id.*)

At step three of the disability determination procedure, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13–14.) Although Plaintiff met the "A criteria" for Listing 12.03, Schizophrenic, Paranoid and Other Psychotic Disorders (Tr. 13), he did not meet the "B criteria" of the listing, which require that the impairment result in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (*Id.*) The ALJ concluded that Plaintiff had mild restrictions in activities of daily living because he was independent with dressing, grooming, driving, and chores. (*Id.*) Plaintiff had only mild difficulties in maintaining social functioning because he went to town to dine and visit with friends. (*Id.*) Plaintiff also had only mild difficulties in maintaining concentration, persistence, or pace because his thinking was clear. (*Id.*) And Plaintiff had one or two episodes of decompensation because he was hospitalized. (*Id.*) The ALJ

found no evidence that Plaintiff met the "C criteria" of the listing because he "does not have marginal adjustment, and does not have the inability to function outside a highly supportive living arrangement."  (*Id.*)

The ALJ determined at step four that Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations:  limited to simple, repetitive, unskilled work tasks; limited to brief, superficial contact with other people; limited to low stress jobs and low productivity expectations (i.e., no assembly line work).  (Tr. 14.)  The ALJ also concluded that Plaintiff could not perform his past relevant work.  (Tr. 16.)

At step five of the disability determination, based on the vocational expert's testimony, the ALJ found that there were other jobs that existed in significant numbers in the national economy that Plaintiff could perform, including farm worker, night cleaner, and cleaner.  (Tr. 17.)

## DISCUSSION

### I.    Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

Courts must affirm the ALJ's findings if supported by substantial evidence in the record. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." *Id.* (quotations omitted). The Court must consider evidence that supports and detracts from the ALJ's decision. *Id.* (citations omitted). After reviewing the evidence, if it is possible to draw two inconsistent positions from the evidence, and one of those positions is that of the ALJ, the court must affirm the ALJ. *Id.* (citations omitted).

## II.     Analysis of the ALJ's Decision

### A.     New evidence submitted to the Appeals Council

Plaintiff fails to distinguish between evidence submitted to the ALJ before the ALJ issued his decision, and new evidence submitted to the Appeals Council after the ALJ's decision.  The distinction is important for two reasons.  First, the Court has a different standard of review for evidence submitted to and considered by the Appeals Council.  When the Appeals Council considers new and material evidence but denies review, the Court's task is to determine whether the record as a whole, including the new evidence, supports the ALJ's determination.  *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000).  Second,  the "timing of an examination is not dispositive of whether evidence is material; medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision."  *Id.* at 502.  Evidence that either pre-dates or post-dates the relevant time period should be addressed to determine whether the evidence related to conditions that existed during the relevant time period.  *Id.*  The Court will apply this standard in its review.  *See Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992) (concluding new evidence submitted to Appeals Council did not change court's determination that substantial evidence supported the ALJ's final decision).

### B.     Whether Plaintiff met or equaled a listed impairment

Plaintiff contends that he meets Listing 12.03 for paranoid schizophrenia and Listing 12.06 for PTSD.  The Listing of Impairments describe, for each of the

major body systems, impairments considered to be severe enough to prevent an individual from performing any gainful activity regardless of his age, education, or work experience. 20 C.F.R. § 404.1525(a). An impairment meets the requirements of a listing "when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." *Id.* § 404.1525(c)(3).

### 1. Listing 12.03: Schizophrenic, Paranoid, and Other Psychotic Disorders

The medical expert testified that Plaintiff meets the A criteria of Listing 12.03 (Tr. 45); the dispute is over whether Plaintiff met the B or C criteria, either one of which, in addition to the A criteria, would satisfy the listing requirements. 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.03. To establish the B criteria, Plaintiff must show that his mental impairment resulted in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[13] *Id.* § 12.03(B).

Plaintiff contends that he is markedly limited in daily activities, social functioning, and concentration, persistence, or pace, as evidenced by

---

[13] Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning. 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00C(4). The phrase "each of extended duration" means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. *Id.*

Dr. Planavsky's opinion in the mental residual functional capacity questionnaire dated August 14, 2006. The Commissioner argues that Plaintiff did not meet the "B criteria" for Listing 12.03 because he could take care of himself and his household chores and go out with friends; thus, he was not markedly limited in any of the first three categories.

Keeping in mind that the relevant time period for Plaintiff's claim is only three months—January 1, 2003, through March 31, 2003—substantial evidence in the record supports the ALJ's determination that Plaintiff was not markedly limited in daily activities, social functioning, or concentration, persistence, or pace during that period. The most relevant evidence is the one treatment record during that period. On February 18, 2003, Plaintiff was compliant with his medication and did not report or exhibit any symptoms during his visit with Dr. Planavsky. (Tr. 554.) And Plaintiff said his farm was doing well. (*Id.*) In fact, Dr. Planavsky agreed to decrease Plaintiff's medication, instructing Plaintiff to call if he did not function as well on less medication. (*Id.*)

Going back one year from the alleged onset date to January 2002, Plaintiff was stressed at that time because his wife was in the hospital, and he had financial troubles. (Tr. 550.) Plaintiff did not exhibit or report any symptoms to Dr. Planavsky, and Plaintiff said he felt his medication would help get him through the difficult time. (*Id.*) Plaintiff was preoccupied with his farm work in May 2002, and had no symptoms then or in August 2002. (Tr. 551–52.) In November 2002, Plaintiff reported some unusual thoughts occurring after he was

late getting his medication, but Dr. Planavsky saw no evidence of symptoms, and Plaintiff said his symptoms "stayed out of his awareness" on his current medication.  (Tr. 553.)

In May 2003, two months after Plaintiff's date last insured of March 31, 2003, despite his financial stress, Plaintiff was functioning well and planning to sell his farm and get a job.  (Tr. 555.)  Again, Plaintiff asked for a decrease in medication and Dr. Planavsky agreed.  (*Id.*)  According to Dr. Planavsky, Plaintiff exhibited no symptoms and was doing very well in August 2003.  (Tr. 556.) Plaintiff had symptoms of delusional thoughts of a grand conspiracy when he did not get his medications on time in November 2003.  (Tr. 557.)  But Plaintiff's delusional thoughts were already diminishing by the time he saw Dr. Planavsky, and he agreed to increase his medication.  (*Id.*)  Plaintiff was back to his usual functioning by December 15, 2003, and Dr. Planavsky decreased his medication again.  (Tr. 558.)  At that time, Plaintiff again looked for employment.  (*Id.*)  By October 2004, Plaintiff's thinking was clear, and he had fewer worries.  (Tr. 561.) In fact, Plaintiff did not report any mental health related symptoms until January 2006, when he was evaluated for PTSD.  (Tr. 249–50.)

Including the one year before and almost three years after the relevant time period, the record does not support Plaintiff's contention that he suffered marked limitation in activities of daily living, social functioning, or maintaining concentration, persistence, or pace.  It was not until 2008, when Plaintiff was arrested for violating a protective order and stalking his ex-wife, prompted by

disagreements over their divorce settlement, that Plaintiff exhibited marked limitations in functioning. During the relevant time period, there is no indication that Plaintiff could not perform his regular daily activities, get along with others, and concentrate and persist in mental tasks.

Plaintiff asserts that he did not always share his difficulties with his mental health providers, and that may be true; he may have experienced unreported symptoms that were not obvious to his mental health providers during or near the relevant time period. However, if two conclusions can be drawn from the evidence, and one of those conclusions is that reached by the ALJ and it is supported by substantial evidence, the Court must affirm the ALJ. *Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)). That is the case here.

Plaintiff also alleges he meets the C criteria of Listing 12.03. To meet the C criteria of the listing, Plaintiff must establish:

> Medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1.      Repeated episodes of decompensation, each of extended duration; or
>
> 2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.     Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03(C).

Plaintiff was under a great deal of stress leading up to and shortly after his alleged period of disability because he faced selling the farm where he had worked for thirty years, his wife had been in the hospital, and then he and his wife were separated for a short time. However, this stress did not cause Plaintiff to decompensate. Not taking his medication on time caused Plaintiff to briefly have symptoms, but not with the frequency or duration to establish the C criteria. And there is no evidence to suggest that Plaintiff was unable to function outside a highly supportive living arrangement. Plaintiff lived and worked on his farm in 2003, he was usually compliant with his psychotic medication, and he was not hospitalized since 1995. In sum, substantial evidence in the record supports the ALJ's determination that Plaintiff did not meet or equal Listing 12.03.

## 2.     Listing 12.06: Anxiety Related Disorders

Plaintiff also contends that the ALJ failed to consider and determine that he met Listing 12.06 for PTSD. The Commissioner argues the ALJ addressed evidence of PTSD and gave good reasons for finding it was not a severe impairment. Again, the parties focus on whether Plaintiff met the B or C criteria of the listing.

"There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported

by the record." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  A

claimant must meet the A criteria and either the B or the C criteria to establish a

listing level impairment under § 12.06.  20 C.F.R., Part 404, Subpart P, Appendix

1, § 12.06.  The B criteria for Listing 12.06, Anxiety Related Disorders, are the

same as the B criteria for Listing 12.03.  Paragraph C requires that the

impairment results in complete inability to function independently outside the

area of one's home.

Plaintiff contends that he suffers PTSD, citing treatment records from

social worker Michael Knapp, a September 28, 2008 competency evaluation in a

criminal proceeding, and a July 8, 2009 100% VA disability rating for PTSD.

Plaintiff argues that the ALJ erred by relying on an earlier VA record, where

Plaintiff did not provide the VA with sufficient evidence to establish PTSD.

Plaintiff also relies on Dr. Planavsky's responses on the August 14, 2006 mental

residual functional capacity questionnaire to establish that he met the A, B, and C

criteria for Listing 12.06.

The Commissioner points out that the favorable VA decision came after

several rejections by the VA of Plaintiff's claim, and the favorable decision was

more than six years after Plaintiff's date last insured.  Thus, the Commissioner

argues that during and shortly after Plaintiff's date last insured, evidence

supports the ALJ's finding that Plaintiff did not have a severe impairment of

PTSD.

For the same reasons that Plaintiff did not meet the B criteria for Listing 12.03 during the relevant time period, Plaintiff also failed to establish that he met the same B criteria for Listing 12.06. Plaintiff first applied for service-connected PTSD disability in 1995, and the VA denied his claim in 1996. (Tr. 441–44.) Plaintiff neither reported PTSD symptoms nor sought treatment for PTSD until January 2006, three years after the relevant time period for his social security disability claim. When Plaintiff underwent a PTSD evaluation at the VA in February 2007, he reported that among the reasons for why he applied for VA disability was because he was under considerable financial distress for years and other veterans encouraged him to apply for disability. (Tr. 463–64.) Dr. Engdahl, who performed the evaluation, noted that Plaintiff said his daily painful memories of Vietnam were brief and not too distracting. (Tr. 464.) And although Plaintiff often had nightmares of Vietnam and had difficulty sleeping during warm weather, Plaintiff admitted that he could usually return to sleep with relative ease unless he was on a "coffee binge." (Tr. 465.) Overall, Dr. Engdahl did not find Plaintiff's PTSD symptoms to be significantly interfering with his life, noting that Plaintiff went into town to eat and socialize every day. (*Id.*) Additionally, Plaintiff's scores on the MMPI-2 personality test were invalid and suggested Plaintiff over-endorsed symptoms. (Tr. 466.)

Plaintiff's VA disability claim was denied in April 2007. (Tr. 476–84.) After that, Plaintiff reported greater PTSD symptoms (Tr. 304, 305), but at other times reported no symptoms. (Tr. 304, 322.) On May 15, 2007, Dr. Planavsky noted

that Plaintiff's current medication regimen "really seems to keep him symptom free." (Tr. 323.) Dr. Planavsky did not distinguish between Plaintiff's psychotic symptoms or PTSD symptoms. Furthermore, Dr. Planavsky never mentioned PTSD in any of his treatment records before January 2008, when Plaintiff asked him to coordinate with the VA. (Tr. 573.) Therefore, substantial evidence in the record supports the ALJ's conclusion that Plaintiff did not have a severe mental impairment of PTSD during the first three months of 2003.

Evidence submitted to the Appeals Council after the ALJ's decision, including the 100% VA disability determination for PTSD and evaluations of Plaintiff by Dr. Dennis and Dr. Delvin, do not overcome the substantial evidence in the record supporting the ALJ's decision. Dr. Dennis evaluated Plaintiff in September 2008 and explained how PTSD, having resolved in the past, could resurface when a person's immediate memory declined. (Tr. 619.) Dr. Dennis stated, "Mr. Colbenson has PTSD, early-impaired memory, and rigid thinking. At the time of assessment, he still has the capacity to understand the criminal proceedings and participate in his defense, but this capacity appears to be declining." (*Id.*) Dr. Dennis' explanation suggests that Plaintiff had PTSD that had resolved but resurfaced due to his early-impaired memory. Because Plaintiff's memory was only "early-impaired," as determined by testing Plaintiff underwent at that time, substantial evidence in the record does not support Plaintiff's contention that he met Listing 12.06 for PTSD five years earlier.

Dr. Delvin's evaluation of Plaintiff in April 2009 likewise fails to establish that Plaintiff met Listing 12.06 during the relevant time period. Dr. Delvin found Plaintiff's acute symptoms to be controlled by medication (Tr. 614), which is consistent with the treatment records near the relevant time period at issue here. Dr. Delvin did not find a strong history of Plaintiff acting on impulsive aggression or having control issues within relationships. (*Id.*) As Dr. Delvin noted, Plaintiff's adjustment to his divorce was complicated by his tendency to be suspicious, resulting in poor judgment with respect to dealings with his ex-wife. (Tr. 614–15.) Plaintiff and his wife were married and getting along during the short time period relevant here. (Tr. 554–55.) Nothing in Dr. Delvin's evaluation suggests that Plaintiff was markedly impaired in 2003 by PTSD and/or paranoid schizophrenia symptoms. Furthermore, substantial evidence in the record does not support Plaintiff's assertion that he met the C criteria of Listing 12.06 in 2003, which included a complete inability to function independently outside the area of one's home. Plaintiff lived and worked on his farm in 2003, and received fairly infrequent psychiatric medication management.

### C. Whether the ALJ's RFC determination is supported by substantial evidence in the record

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In determining a claimant's RFC, the ALJ must consider all relevant evidence and evaluate the claimant's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). The ALJ must consider every

medical opinion in the record.  20 C.F.R. § 404.1527(c).  If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence, it is given controlling weight.  *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012).  "However, '[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole.'"  *Id.* (quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011).  An ALJ can discount or disregard a treating physician's opinion if other medical opinions are supported by better or more thorough medical evidence or if the treating physician renders inconsistent opinions.  *Id.*

### 1.    Whether the ALJ failed to give appropriate weight to Dr. Planavsky's opinion

Plaintiff asserts that the ALJ should have adopted the treating physician's opinion that Plaintiff's impairments would result in him missing more than four days of work per month, and that he could not complete a normal workday and workweek without interruption from psychologically based symptoms.  In addition to the questionnaire that Dr. Planavsky completed in August 2006, Plaintiff cites Dr. Planavsky's November 8, 2007 disability opinion letter to Plaintiff's attorney, and Dr. Planavsky's March 18, 2009 letter to the VA supporting Plaintiff's PTSD disability rating at 70 to 100%.  Plaintiff concludes that the exceptions to the treating physician controlling weight rule are not present here.

Plaintiff also contends that the ALJ's reliance on the medical expert's opinion as the basis for the RFC determination was improper because a nonexamining physician's opinion does not generally constitute substantial evidence. Plaintiff asserts that Dr. Steven's opinion should not have been granted substantial weight because she did not have the benefit of reviewing the VA 100% disability determination. In addition, Plaintiff contends that the ALJ's RFC determination was not consistent with Plaintiff's daily activities, because his activities were not equivalent to the ability to engage in gainful activity.

The Commissioner asserts that the ALJ gave good reasons for rejecting Dr. Planavsky's opinions – primarily that his treatment notes overwhelmingly contradicted his opinions. Specifically, the Commissioner asserts that Dr. Planavsky consistently and frequently found Plaintiff to be doing well, exhibiting few if any symptoms, and even agreed to decrease Plaintiff's medication because it was effective. The Commissioner also argues that the ALJ considered the medical expert's opinion as only one factor in the RFC determination, and that he also addressed all of the treatment records. Further, the Commissioner contends the ALJ properly considered non-medical evidence such as Plaintiff's work history, daily activities, and alternative motivation for seeking disability benefits.

In weighing the medical opinions, the ALJ discounted Dr. Planavsky's opinions (Exhibits 10F, 14F, and 16F) because they were inconsistent with his office visit notes, which repeatedly noted that once Plaintiff was treated with the

proper dosage and timing of medication, he had no symptoms and handled all aspects of his life well. (Tr. 16.) In addition to this, the ALJ found that Plaintiff had a possible motivation for secondary gain to supplement his farm income. (Tr. 15.) The ALJ cited evidence that Plaintiff had only $20,000–$30,000 gross farm income, and that in May 2003, Plaintiff told Dr. Planavsky that he planned to sell his farm, move to town, and find a job. (*Id.*)

Substantial evidence in the record supports both reasons the ALJ gave for discounting Dr. Planavsky's opinions. Most importantly, there is no support in any of Dr. Planavsky's treatment records for the years 1999 through 2007, four years before and three years after the relevant time period, to support his opinion that Plaintiff had very limited ability to function. (Tr. 550–58, 561.) Dr. Planavsky's records indicate that Plaintiff's psychotic disorder was controlled by medication, with very few, brief relapses of delusional thinking when he did not take his medication on time. (*Id.*) Overall, during and near the relevant time period in 2003, Dr. Planavsky felt that Plaintiff was doing well amidst great financial and personal stress. (*Id.*) As previously noted, Dr. Planavsky even agreed to decrease Plaintiff's medication. (Tr. 555, 558.) Dr. Planavsky's opinions appear to be consistent only with Plaintiff's functioning when he was hospitalized in the 1990s, long before his medication compliance controlled his symptoms.

There is also substantial evidence in the record supporting the ALJ's conclusion that Plaintiff had financial motivation, apart from inability to work, to

seek disability income.  *See Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir. 1996) (stating that an ALJ can consider an element of secondary gain in assessing claimant's credibility).   In May 2003, just two months after Plaintiff's date last insured, Plaintiff told Dr. Planavsky that he was facing the loss of his farm, and that he and his wife were talking about getting jobs after the farm sold.  (Tr. 555.) Plaintiff was looking for employment in 2003 because he was no longer making money from his farm.  (Tr. 558.)  In June 2006, Plaintiff was still trying to ward off foreclosure on his farm.  (Tr. 310.)  Plaintiff told Dr. Engdahl, who was evaluating him for service-connected PTSD in 2007, that he was prompted to apply for VA disability because he had been under considerable financial distress for years. (Tr. 463–64.)  Therefore, it was reasonable for the ALJ to conclude from the evidence that Plaintiff may have quit working full-time on his farm because it was no longer producing sufficient income, not because of his mental impairments.

Plaintiff also challenges the ALJ's reliance on the medical expert's opinion because the medical expert never examined Plaintiff and did not review the 100% VA disability determination.  An ALJ may consider an independent medical expert's opinion as one factor in determining the nature and severity of a claimant's impairments.  *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004).  In addition, an ALJ may disregard a treating physician's opinion and give greater weight to a medical assessment that is supported by better or more thorough medical evidence.  *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

As discussed above, Dr. Planavsky's opinion was not at all consistent with his treatment notes during and near the relevant time period. Dr. Stevens, on the other hand, opined that Plaintiff would have some work limitations by virtue of a serious diagnosis like paranoid schizophrenia, even if his symptoms were under control with medication. (Tr. 43, 46.) Therefore, she opined that Plaintiff would be restricted to work involving reduced contact with others, and she restricted the complexity and stress level of work Plaintiff could perform. (Tr. 46.) Dr. Stevens disagreed with Dr. Planavsky's RFC opinions because they were not consistent with Plaintiff's condition during the relevant time-frame, which was symptom-free and medication compliant. (Tr. 47–48.) Evidence created and submitted after the hearing on September 17, 2008, which Dr. Stevens did not review, did not shed light on Plaintiff's condition five or more years earlier but reflected post-hearing deterioration. Therefore, substantial evidence in the record as a whole supported the ALJ's decision to give more weight to Dr. Steven's RFC opinion.

Finally, Plaintiff's daily activities during and near the relevant time period are also inconsistent with Dr. Planavsky's opinion that Plaintiff would miss more than four days of work per month and could not complete a normal workday and workweek without interruption from psychologically based symptoms. In addition to the fact that Plaintiff had limited treatment and was mostly symptom-free, Plaintiff sold part of his farm to avoid foreclosure (Tr. 555), worked out his financial difficulties "in an orderly and thoughtful manner" (Tr. 556), and looked

for employment.  (Tr. 558.)  For all of these reasons, the ALJ's RFC

determination is supported by substantial evidence in the record as a whole.

### 2.    Whether remand is necessary because the ALJ failed to consider the 100% VA disability finding

Plaintiff incorrectly framed this issue – the ALJ did not improperly fail to

consider the July 8, 2009 VA disability decision, because it did not exist at the

time of the ALJ's October 17, 2008 decision.  None of the evidence in the

administrative record dated after October 17, 2008 was considered by the ALJ

but was submitted to the Appeals Council.  Under such circumstances, the

question for the Court is whether the record as a whole, including the new

evidence, contains substantial evidence supporting the ALJ's decision.

In the VA rating decision, the VA summarized the evidence it considered

and gave the reasoning for its decision in one sentence:  "[A]n evaluation of 100

percent is warranted because you exhibit chronic symptoms that have in the

distant and recent past included a danger of hurting yourself or others.  It

appears that this level of impairment is reasonably certain to continue, and we

find it is permanent in nature."  (Tr. 629.)  Plaintiff did not exhibit the type of

delusional, paranoid, agitated, or anxious symptoms during the relevant time

period that were found in the distant past, when he was untreated by medication

and hospitalized in the 1990s.  Nor did he, in 2003, exhibit any symptoms

suggesting poor impulse control or bad judgment, like that leading to his violation

of a protective order and stalking his ex-wife in 2008.  The change in Plaintiff's

condition in 2008 was linked to disputes over his divorce settlement; a very recent change in medication from Prolixin to Invega, which allowed him to experience emotions he had not experienced in a long time; and, according to Dr. Dennis, early-memory impairment and other factors triggering a relapse of PTSD symptoms. (Tr. 612–14, 619–23.) None of this later evidence changes the fact that substantial evidence in the record as a whole supports the ALJ's conclusion that Plaintiff was not disabled from January through March 2003.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 10), is **DENIED**;

2.      Defendant's Motion for Summary Judgment (Doc. No. 14), is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: September 11, 2012          __*s/ Jeffrey J. Keyes*_____
                                  JEFFREY J. KEYES
                                  United States Magistrate Judge